# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| BARTLETT MUSLIM SOCIETY, § | | |
| § | | |
| *Plaintiff*, § | | |
| § | | |
| v. § | Case No. 2:25-cv-02746-MSN-cgc | |
| § | | |
| CITY OF BARTLETT, TENNESSEE, § | | |
| § | | |
| *Defendant*. § | | |

## FIRST AMENDED COMPLAINT

### I.  INTRODUCTION

1. Plaintiff Bartlett Muslim Society seeks to build a mosque on land that it owns in Bartlett, Tennessee.

2. In response to the Plaintiff's application for a Special Use Permit, the City of Bartlett (the "City") subjected the Plaintiff to extensive, expensive, and purposeless delay as part of a sham permitting process.

3. After the Plaintiff complied with these extensive, expensive procedural requirements—and despite City staff's recommendation of approval—the City denied the Plaintiff's Special Use Permit application based on arbitrary, predetermined reasons and religious animus.

4. The City has approved similarly situated churches—including Christian Life Tabernacle—for a Special Use Permit under comparable or less favorable circumstances.

5. In denying the Plaintiff's Special Use Permit application, the City has

imposed a substantial burden on the Plaintiff's religious exercise, treated it unequally, and discriminated against it based on religion.

6. Federal and state law guarantee broad protection of religious freedom, including heightened protections for the right of religious institutions to construct places of worship unless the government can overcome strict scrutiny.

7. Accordingly, the Plaintiff files this civil-rights action under the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc et seq., and Tennessee's Preservation of Religious Freedom Act, Tenn. Code Ann. § 4-1-407.

8. To redress the City's violations of the Plaintiff's religious-freedom rights, the Bartlett Muslim Society petitions this Court for appropriate injunctive and declaratory relief as well as compensatory damages.

## II.  PARTIES

9. Plaintiff Bartlett Muslim Society is a nonprofit religious organization incorporated in Tennessee with an active status as of October 2, 2025.

10. Defendant City of Bartlett is a municipal government in Tennessee.

## III.  JURISDICTION AND VENUE

11. This Court has original jurisdiction over the federal questions presented in this lawsuit under 28 U.S.C. § 1331 and supplemental jurisdiction over the Plaintiff's state-law claims under 28 U.S.C. § 1367.

12. Venue lies in this Court under 28 U.S.C. 1391(b)(1)–(2).

## IV.  FACTUAL ALLEGATIONS

A. **THE PLAINTIFF'S RELIGIOUS NEEDS FOR A NEW FACILITY.**

13. The Plaintiff is a Muslim religious organization that comprises roughly 20 families.

-19-

14. These member families are observant Muslims whose religious practice and beliefs are sincere.

15. The Plaintiff currently rents worship space in a commercial retail space that is inadequate to meet its religious needs because of its size, location, and design.

16. The Plaintiff's current facility is too small; it fits only 20-30 people at a time. It does not contain office space, nor a space for a library or reading room, nor permanent rooms for men and women to pray separately.

17. Only a thin cloth curtain hangs between the two spaces separating men and women—an inadequate and temporary solution. The space for women is small and can only fit 4-5 women at a time.

18. The ability for men and women to pray separately—especially during Ramadan when attendance is higher—is an important aspect of the Plaintiff's faith and religious exercise. However, the Plaintiff's current facility lacks adequate space to accommodate this religious need.

19. The Plaintiff's current facility also lacks adequate sex-segregated bathrooms (there are only two, single-stall bathrooms) and a proper place for ablution (the ritualistic washing of hands and feet before prayer).

20. Ablution is performed before prayer, according to the Muslim faith, and it requires a basin and other equipment not found in a typical bathroom like those in Plaintiff's current facility.

21. The Plaintiff's current facility does not have any kitchen facilities in which to prepare or serve the customary meal for holiday of Ramadan.

22. Presently, food is served on paper plates and on temporary tables without any place to store or wash food and utensils.

-19-

23. Because, according to the Plaintiff's religious faith, the Ramadan meal must be eaten in sex-segregated space, the Plaintiff's female members only have a very small space in which to eat.

24. Given this lack of space, women often leave the current facility after the Ramadan prayers, and they are unable to observe the Ramadan feast with their families.

25. The Plaintiff's current facility is not suited to host an imam or large groups who wish to hear an imam speak.

26. To hear instruction by a qualified imam, the Plaintiff's members must currently drive 30 minutes or more into Memphis.

27. Driving over an hour is impracticable for most of the Plaintiff's members.

28. The Plaintiff's current facility is a temporary, rented commercial space that lacks the reverent, solemn design of a mosque—a venerated house of worship.

29. The commercial space located next door to the Plaintiff's facility is available for rent by members of the public and frequently is rented to host parties.

30. During Ramadan and other quiet times of prayer, the Plaintiff members' prayer has been interrupted by music from parties next door.

31. Community-based religious engagement with members' children is an important part of the Plaintiff's member families' faith and religious exercise.

32. The Plaintiff's members need a space where they can spend time collectively with other families in the mosque to strengthen their religious, cultural, and family identities, and to provide organized religious education and activities for

the children.

33. However, the Plaintiff's current facility cannot accommodate these needs. There is no space for children to gather or play; the only open space is the parking lot.

34. The Plaintiff's proposed plan for a mosque will much better facilitate members' ability to regularly attend religious services (especially women), celebrate Ramadan, perform ablution, educate children, host imams and larger groups, and pray without interruption in a permanent and revered space.

**B.  THE CITY DELAYS THE PLAINTIFF'S EFFORTS TO OBTAIN A SPECIAL USE PERMIT BY REQUIRING AN EXTENSIVE TRAFFIC STUDY.**

35. To address its members' needs, in 2023, the Plaintiff purchased 8.244 acres of land on Broadway Road in Bartlett, Tennessee, zoned "R-E" Residential Estate.

36. Subject to issuance of a Special Use Permit, the City's zoning ordinance permits construction of religious institutions in the district where the Plaintiff's land is located.

37. On September 5, 2023, the Plaintiff submitted a complete Special Use Permit application to construct a 5,000 sq. ft. mosque (with a planned expansion to 15,000 sq. ft.), 165 parking spaces, and access from Broadway Road.

38. The Plaintiff's application was submitted by civil engineer David Bray, of The Bray Firm, on behalf of Badrul Hossain, the President of the Plaintiff's Board.

39. The City's Planning Commission discussed the Plaintiff's application at its October 2, 2023 meeting.

40. At the public hearing, residents expressed overt anti-Muslim animus.

41. One public speaker declared that Muslims "do not believe in God."

42. Another urged the Plaintiff's members to attend his Christian church instead.

43. City officials present did not rebuke these statements.

44. Both Mr. Hossain and Mr. Bray were present at this meeting and were available to explain the Plaintiff's building plans and to answer any questions.

45. During this meeting, Mr. Hossain stated repeatedly that the Plaintiff would consider any concerns that the City's Board of Mayor and Aldermen and the broader community had about the Plaintiff's proposed project.

46. Mr. Hossain also indicated that the Plaintiff would consider altering construction plans to accommodate such concerns.

47. Mr. Bray indicated that the Plaintiff's building plans were at the "conceptual stage" and could be changed to address issues, like proper land drainage, that may arise.

48. Upon review, the Commission voted unanimously to require the Plaintiff to conduct an extensive traffic study and to stay consideration of the application unless and until the study could be completed.

49. The Plaintiff—unlike other applicants for a Special Use Permit—thus was required to conduct a traffic study and to conduct the study at it is own significant expense.

50. A public records request would later reveal private text message correspondence between a Planning Commission member and an Alderman, sent

-19-

after the Commission ordered the traffic study and calling the mandated traffic study was "a total was of time and money":



51. Unable to proceed in the permit process until the mandatory traffic study was conducted, the Plaintiff retained Dr. Martin Lipinski, a transportation expert with more than thirty-five years of experience, to conduct the study.

52. City engineers provided the Plaintiff with detailed standards for conducting the study.

53. Traffic engineers employed by the City communicated with Dr. Lipinski directly to convey the standards for the study.

54. Dr. Lipinski then conducted the required traffic study at a cost to Plaintiff of over $20,000.00.

55. Dr. Lipinski's study included more than 120 pages of data and analysis.

56. Dr. Lipinski's conclusions were based, in part, on his studies of traffic flow around existing Memphis-area mosques.

57. Dr. Lipinski's study found that the Plaintiff's proposed mosque would have no adverse traffic impacts, even if expanded to the full extent of the building plans.

58. Dr. Lipinski's study found that the Plaintiff's proposed mosque posed no

-19-

concerns related to traffic volume or safety, and that no traffic mitigation measures would be necessary to accommodate the new building, even accounting for annual traffic increases.

59. Dr. Lipinski's study also called into doubt earlier-expressed concerns about traffic at the nearby intersection, finding that traffic tended to dissipate quickly.

60. Based on Dr. Lipinski's study, the City's Planning Director, Kim Taylor, recommended approval of the Plaintiff's Special Use Permit with reasonable engineering conditions.

### C. THE CITY IGNORES THE TRAFFIC STUDY'S CONCLUSIONS AND REJECTS THE PLAINTIFF'S PERMIT APPLICATION AFTER COMMUNITY MEMBERS EXPRESS ANTI-MUSLIM ANIMUS.

61. The Planning Commission discussed the results of Dr. Lipinski's study at its public hearing on December 2, 2024.

62. To address comments made by community members at the previous meeting regarding the large parking lot, the Plaintiff also submitted a revised building proposal in advance of this meeting, reducing the proposed number of parking spaces from 165 to 52. Despite this—and despite the traffic study's conclusions having been favorable to the Plaintiff—the Planning Commission voted unanimously to recommend denying Plaintiff a Special Use Permit.

63. One Commissioner, Vice Mayor Jack Young, admitted that his decision to reject the mosque's permit was predetermined, and that he was unwilling to accept the traffic study's conclusions.

64. Vice Mayor Young stated: "It doesn't matter to me about a study, I

-19-

actually live through it."

65. Vice Mayor Young also expressed baseless suspicion about why the Plaintiff had revised its plans, suggesting that the Plaintiff's decision to reduce its parking spaces was evidence that it was hiding information and being dishonest about its plans for expanding the mosque.

66. The Planning Commission also questioned why certain data, like what traffic flows would look like on certain surrounding streets, had not been included in the study.

67. However, the study included all information previously required by the City, as communicated by City officials directly to Dr. Lipinski.

68. On February 11, 2025, despite being warned of the heightened legal protections for houses of worship in zoning matters, the City, through its Board of Mayor and Aldermen, affirmed the recommendation of the Planning Commission and formally denied the Plaintiff's Special Use Permit application.

69. Denying the Plaintiff's Special Use Permit application despite the results of the traffic study—which was conducted at the City's insistence, based on the City's own directions and standards, and concluded that the proposed mosque would present no traffic concerns—being favorable to the Plaintiff was arbitrary.

70. The real reason the Plaintiff's permit was denied was anti-Muslim animus.

D. **THE CITY HAS GRANTED PERMITS TO CHURCHES WITHOUT IMPOSING THE SAME ONEROUS APPROVAL PROCESS AND DESPITE MORE SERIOUS TRAFFIC CONCERNS.**

71. The City has granted non-Muslim religious institutions a Special Use

-19-

Permit under the same zoning classification, notwithstanding similar or more serious concerns about traffic being presented for those projects.

72. Christian Life Tabernacle Church—a Christian religious institution—applied for and received a Special Use Permit in 2024 without being subjected to an extended approval process or expensive requirements like those with which the Plaintiff was saddled.

73. The City granted Christian Life Tabernacle Church's Special Use Permit applications in a matter of mere months.

D. **THE PLAINTIFF REQUIRES INJUNCTIVE RELIEF TO REMEDY ITS ONGOING HARMS.**

74. The City's decision to deny the Plaintiff a Special Use Permit has left the Plaintiff without a viable religious facility or location to build a mosque.

75. The Plaintiff cannot expand its existing building, and the City's zoning system provides no other reasonable, available location for the Plaintiff to build.

76. The Plaintiff's plan to build a mosque has been delayed by almost two years.

77. The Plaintiff has incurred significant costs in its (futile) endeavor to build a mosque that complies with the City's rigorous demands.

78. The Plaintiff purchased the lot for $167,000.00, spent over $36,000.00 on land maintenance and improvements (many of which were required by the City), conducted water use and other studies (as required by the City) at a cost of $2,500.00, and paid for plans by an engineering firm and traffic study at a combined cost of nearly $30,000.00.

79. The Plaintiff thus has been forced to undergo an arduous and expensive

-19-

permitting process for no reason; the City will not grant the Plaintiff a permit regardless of the outcome of its mandated traffic study.

80. The City's denial of a Special Use Permit has caused the Plaintiff significant financial harm, delayed the construction of a much-needed religious facility, and substantially burdened the Plaintiff's members' ability to gather and worship according to their sincerely held religious faith—all in violation of the mosque's and its members' religious-freedom rights.

## V. CAUSES OF ACTION

### Count I: Violation of RLUIPA – Substantial Burden Clause: 42 U.S.C. § 2000cc(a)(1)

81. The Plaintiff incorporates and realleges the foregoing allegations as if fully set forth herein

82. The City's decision to deny the Plaintiff a Special Use Permit constitutes the imposition and implementation of a land use regulation under RLUIPA.

83. The Plaintiff's intended use of the subject property—for religious worship and religious education—is a religious exercise protected by RLUIPA.

84. The City's denial has caused the Plaintiff delay and financial harm, and it has deprived the Plaintiff's members of their ability to exercise their religious faith.

85. The Plaintiff spent nearly two years and thousands of dollars on the City's sham Special Use Permit approval process.

86. Even so, the Plaintiff still is unable to construct a house of worship in the community where its members reside.

87. The City's denial also has forced the Plaintiff to continue operating in a temporary commercial office space that is inadequate to meet the needs and religious

practices of its members.

88. The burden imposed by the City's denial of a Special Use Permit is substantial; it directly inhibits the Plaintiff's core religious mission; and it interferes with the Plaintiff's ability to meet the spiritual needs of its members.

89. The City's denial has left the Plaintiff without a facility that can accommodate religious education and activities for its members' children.

90. This burden directly inhibits the Plaintiff's core religious mission of (1) teaching Muslim values to children who are part of the Plaintiff's community and (2) supporting families in their attempts to build cohesive religious, cultural, and family identities.

91. The City's denial also has left the Plaintiff without a facility where men and women can pray separately during Ramadan.

92. This burden directly inhibits the Plaintiff's core religious mission of ministering to its female members in accordance with religious and cultural expectations around modesty.

93. This burden has inhibited the Plaintiff's ability to minister to and serve some female members altogether.

94. The City's purported justification for denying the Plaintiff a Special Use Permit—generalized traffic concerns that are disproven by the very traffic study the City ordered—is not a compelling governmental interest.

95. Even if a compelling governmental interest existed, the City's blanket denial of the Special Use Permit is not the least restrictive means of furthering that interest.

96. The City has rejected any attempt at compromise and solution.

97. The City also ignored the Plaintiff's offers to adjust its plans to accommodate community concerns.

98. The City's denial of the Plaintiff's Special Use Permit violates 42 U.S.C. § 2000cc(a)(1).

### Count II: Violation of RLUIPA – Nondiscrimination Clause
### 42 U.S.C. § 2000cc(b)(2)

99. The Plaintiff incorporates and realleges the foregoing allegations as if fully set forth herein

100. The Plaintiff is a religious assembly or institution within the meaning of RLUIPA.

101. In denying the Plaintiff a Special Use Permit, the City made an individualized assessment of appropriate use for the property at issue based on formal procedures and practices.

102. Thus, the Plaintiff was subject to a land use regulation within the meaning of RLUIPA.

103. The City denied the Plaintiff a Special Use Permit at least in part because Plaintiff is a Muslim religious organization.

104. The Plaintiff's permitting process included public opposition that expressed clear anti-Muslim animus, including statements that "Muslims do not believe in God" and that Muslims should convert to Christianity and join a local church.

105. City officials failed to condemn, disavow, or distance themselves from such statements while overseeing the Plaintiff's application.

106. The Planning Commission voted against the Plaintiff's Special Use Permit at the same meeting during which those remarks were made.

107. The City has approved Special Use Permits for religious uses for other denominations—including Christian churches—that have the same zoning classification, despite similar or greater traffic and infrastructure concerns being expressed as to those projects.

108. The City issued such approvals without imposing the same onerous traffic study requirements it imposed on the Plaintiff despite similar or greater traffic and infrastructure concerns.

109. With respect to Christian institutions that sought a Special Use Permit, the City's Special Use Permit approvals took significantly less time.

110. The City denied the Plaintiff a Special Use Permit based on concerns about traffic even after a traffic study conducted in coordination with the City determined that construction of a mosque would not exacerbate traffic conditions.

111. The City's decision to deny the Plaintiff a Special Use Permit was based on its dismissal of the results of a traffic study that it commissioned and designed.

112. One Commissioner even admitted that his decision to deny the Special Use Permit was predetermined.

113. Other Commissioners acknowledged privately that they thought the traffic study was a "waste of time" even though they voted to order the Plaintiff to conduct it.

114. The City's purported reasons for denying the Plaintiff a Special Use Permit are baseless, nonsensical, and mere pretext for anti-Muslim animus.

115. The totality of the circumstances shows the City's intentional

-19-

discrimination on the basis of religion in violation of 42 U.S.C. § 2000cc(b)(2).

**Count III: Violation of Tennessee's Preservation of Religious Freedom Act Tenn. Code Ann. § 4-1-407**

116. The Plaintiff incorporates and realleges the foregoing allegations as if fully set forth herein.

117. Tennessee's Preservation of Religious Freedom Act, Tenn. Code Ann. § 4-1-407, provides that:

> (b) Except as provided in subsection (c), no government entity shall substantially burden a person's free exercise of religion even if the burden results from a rule of general applicability.
>
> (c) No government entity shall substantially burden a person's free exercise of religion unless it demonstrates that application of the burden to the person is:
>
>> (1) Essential to further a compelling governmental interest; and
>>
>> (2) The least restrictive means of furthering that compelling governmental interest.

118. Under Tennessee Code Annotated section 4-1-407(a)(5): "'Government entity' means any branch, department, agency, commission or instrumentality of state government, any official or other person acting under color of state law or any political subdivision of the state[.]"

119. The City is a "Government entity" within the meaning of Tennessee Code Annotated section 4-1-407(a)(5).

120. The City's decision to deny the Plaintiff a Special Use Permit to construct a mosque substantially burdened the Plaintiff's religious exercise.

121. The City's decision to deny the Plaintiff a Special Use Permit to construct a mosque was not essential to further any compelling governmental interest.

-19-

122. The City's decision to deny outright the Plaintiff's application for a Special Use Permit to construct a mosque was not the least restrictive means of furthering any compelling governmental interest.

123. The City's decision to deny the Plaintiff a Special Use Permit to construct a mosque after requiring the Plaintiff to undergo an extensive, expensive, and sham permitting process caused the Plaintiff significant actual damages totaling thousands of dollars.

124. Under Tennessee Code Annotated section 4-1-407(e), the Plaintiff is entitled to receive declaratory relief, money damages, and recover its reasonable costs and attorney's fees for the Defendants' violations of Tennessee's Preservation of Religious Freedom Act. *See id.* ("A person whose religious exercise has been burdened by government in violation of this section may assert that violation as a claim or defense in any judicial or administrative proceeding and may obtain such declaratory relief, monetary damages as may properly be awarded by a court of competent jurisdiction, or both declaratory relief and monetary damages. A person who prevails in any proceeding to enforce this section against a government entity may recover the person's reasonable costs and attorney's fees.").

## VI.  PRAYER FOR RELIEF

WHEREFORE, the Plaintiff respectfully requests that this Court enter judgment in its favor and award the Plaintiff:

1. A declaratory judgment that Defendant's actions—including but not limited to the denial of the Special Use Permit—violate the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc et seq., and Tennessee's

Preservation of Religious Freedom Act, Tenn. Code Ann. § 4-1-407;

2. A permanent injunction directing the Defendant to approve the Plaintiff's application for a Special Use Permit and enjoining the Defendant from further acts that substantially burden the Plaintiff's religious exercise, treat it unequally, discriminate on the basis of religion, or unreasonably limit religious land uses;

3. Compensatory damages for the delay, expense, and impairment of Plaintiff's religious mission caused by the Defendant's unlawful conduct;

4. Nominal damages sufficient to vindicate Plaintiff's statutory rights;

5. Reasonable attorneys' fees, expert witness fees, and costs pursuant to 42 U.S.C. § 1988 and Tenn. Code Ann. § 4-1-407(e); and

6. All such other and further relief as the Court deems just, equitable, and proper.

Dated: October 6, 2025

                Respectfully submitted,

/s/ Stella Yarbrough
DANIEL A. HORWITZ, BPR #032176
SARAH L. MARTIN, BPR # 037707
*ALEXANDRA GOMBAR, BPR #039521
HORWITZ LAW, PLLC
4016 WESTLAWN DR.
NASHVILLE, TN 37209
*WDTN Admission Pending

Stella Yarbrough (33637)
Lucas Cameron-Vaughn (36284)
Zee Scout (042637)
ACLU FOUNDATION OF TENNESSEE
P.O. Box 120160
Nashville, TN 37212
syarbrough@aclu-tn.org